# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA
### MINNEAPOLIS DIVISION

| | |
|---|---|
| **JANETTE ZAHIA CORCELIUS**; | **CASE NO.** |
| Plaintiff, | |
| | **JURY TRIAL DEMAND** |
| v. | |
| **MARKWAYNE MULLIN**, Secretary of Homeland Security, United States Department of Homeland Security, in his official capacity; | |
| **RODNEY SCOTT**, Commissioner, United States Customs and Border Protection, in his official capacity; | |
| **TODD LYONS**, Acting Director, United States Immigration and Customs Enforcement, in his official capacity; | |
| **DEREK GORDON**, Acting Executive Associate Director, Homeland Security Investigations, in his official capacity; | |
| **JASON SCHMELZ**, Port Director, Customs and Border Protection, in his official capacity; | |
| **KATHLEEN KOETZ**, Assistant Port Director, Customs and Border Protection, in her official capacity; | |
| Defendants. | |

1

## COMPLAINT

NOW COMES the Plaintiff, Janette Zahia Corcelius ("Plaintiff" or "Corcelius"), by counsel and for her complaint against the Defendants, stating the following:

## Introduction

1. The Plaintiff, Janette Zahia Corcelius, is a Twin Cities labor and community organizer. In April 2026, Corcelius took a three-week trip to Europe, during which she spread news of the Minneapolis City Council resolution, passed in March 2026, encouraging European financial institutions to divest from corporations contracting with the U.S. Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE"). While abroad, she collected a significant amount of political literature on topics including labor organizing, opposition to fascism, opposition to imperialism, and support for Palestinian human rights.

2. When Corcelius returned to the United States on April 30, 2026, U.S. Department of Homeland Security ("DHS") agents stopped her at the customs checkpoint in the Minneapolis-St. Paul International Airport ("MSP" or "MSP Airport") and escorted her to a secondary screening area.

3. Agents from Customs and Border Protection ("CBP") and Homeland Security Investigations ("HSI") twice searched Corcelius' luggage, eventually seizing all of the political literature in her possession. After Corcelius asserted her rights and called her attorney, giving her cell phone to the CBP manager on duty, customs agents informed her that her cell phone was being seized as well. As of the filing of this complaint, the

Government has not returned Corcelius' property, and has presumptively conducted an advanced search of her cell phone.

4.  Corcelius committed no crime, and CBP or HSI agents had no reason to suspect her of committing any crime justifying the seizure and search of her cell phone and her other property. These actions violated Corcelius' Fourth Amendment rights. In fact, Defendants' border search policies violate the Fourth Amendment on their face, by expressly permitting border agents to conduct non-routine searches without reasonable suspicion of any crime.

5.  But the search and seizure of Corcelius' property was not a random violation of her rights. Defendants targeted her at the border because of her advocacy for divestment from DHS and ICE, and the lawful content of the political literature in her possession during the April 30 encounter.

6.  In the past year, President Donald Trump has issued executive orders and directives, notably National Security Protocol Memorandum 7 ("NSPM-7"), that seek to weaponize and exploit the national security apparatus, including law enforcement at international borders, to suppress lawful dissent in the United States. Following these directives, Defendants now treat "left-wing" viewpoints and ideologies associated with "anti-fascism" as inherently suspicious and indicative of a national security threat at the border.

7.  Defendants identified that Corcelius engaged in lawful international advocacy for divestment from DHS and ICE, and that she carried political literature in her luggage that reflects viewpoints opposed to fascism. Defendants responded to these

3

expressions of protected speech with retaliation—targeting her for secondary screening before searching and seizing her property, including an advanced search of her cell phone. Defendants' actions were intended to intimidate ordinary Americans like Corcelius into silence and therefore violated the First Amendment.

**Parties**

*The Plaintiff*

8. Plaintiff Janette Zahia Corcelius is a U.S. Citizen residing in St. Paul, Minnesota.

9. Defendant Markwayne Mullin is the Secretary of Homeland Security. DHS is the umbrella agency of CBP, ICE, and HSI. Mullin is being sued in his official capacity.

10. Defendant Rodney Scott is the Commission of U.S. Customs and Border Protection. CBP is the primary agency charged with control of ports of entry, including international entries into the United States at MSP Airport. Scott is being sued in his official capacity.

11. Defendant Todd Lyons is the Acting Director of Immigration and Customs Enforcement ("ICE"). ICE is the home sub-agency for HSI, and ICE has a regional field office at the MSP Airport. Lyons is being sued in his official capacity.

12. Defendant Derek Gordon is the Acting Executive Associate Director and highest-ranking executive of Homeland Security Investigations. HSI is a subcomponent of ICE tasked with investigating cross-border criminal activity. HSI agents are regularly assigned to participate in the National Joint Terrorism Task Forces

4

("NJTTF"). HSI has a regional field office at the MSP Airport. Gordon is being sued in his official capacity.

13. Defendant Jason Schmelz is the Customs and Border Protection Port Director for Port of Entry #3501, located at the MSP Airport. Schmelz is being sued in his official capacity.

14. Defendant Kathleen Koetz is the Customs and Border Protection Assistant Port Director for Port of Entry #3501, located at the MSP Airport. Koetz was present during the Plaintiff's encounter with Government agents on April 30, 2026. Koetz is being sued in her official capacity.

### Jurisdiction & Venue

15. This Court has jurisdiction under the United States Constitution, Art. III, § 2, because the rights sought to be protected herein are secured by the First and Fourth Amendments. Jurisdiction is further proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. §§ 702, 706, and federal common law.

16. This Court has authority to grant the declaratory relief requested herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, as the action presents an actual case or controversy within the Court's jurisdiction, and pursuant to the general, legal, and equitable powers of this Court.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because the Plaintiff resides in the District, Defendants are officers or employees of the United States Government, Defendants regularly conduct business in Minnesota, a

5

substantial part of the events giving rise to the Plaintiff's claims occurred within this District, and the action involves no real property.

**Factual Allegations**

*Federal Targeting of "Left-Wing" Political Dissent*

18. The White House has recently issued several policy directives to federal agencies, including Defendants, ordering that the agencies treat particular ideologies and viewpoints associated with the "left" in American politics, and critical of President Donald Trump, as evidence of a national security concern or terroristic threat.

19. On September 22, 2025, President Trump issued an executive order purporting to designate "Antifa" as a "domestic terrorism organization,"[1] despite the fact that no such organization exists and that the President lacks any legal mechanism to label "domestic terrorist organizations."[2]

20. Three days later, President Trump issued National Security Presidential Memorandum 7 ("NSPM-7"), titled "Countering Domestic Terrorism and Organized Political Violence." NSPM-7 identifies a number of common "threads" or "recurrent

---

[1] ORDER OF SEPTEMBER 22, 2025: DESIGNATING ANTIFA AS A DOMESTIC TERRORIST ORGANIZATION, 90 Fed. Reg. 46,317.

[2] The fact sheet accompanying the September 22 executive order included a quote from President Trump describing "Antifa" as a "radical left" organization. WHITE HOUSE, Fact Sheet: President Donald J. Trump Designates Antifa as a Domestic Terrorist Organization (Sep. 22, 2025), https://www.whitehouse.gov/fact-sheets/2025/09/fact-sheet-president-donald-j-trump-designates-antifa-as-a-domestic-terrorist-organization. But according to President Trump's own former FBI Director, antifa (short for anti-fascist) is "not a group or an organization" but a "movement or an ideology." Eric Tucker and Ben Fox, *FBI director says antifa is an ideology, not an organization*, AP (Sep. 17, 2020), https://apnews.com/article/donald-trump-ap-top-news-elections-james-comey-politics-bdd3b6078e9efadcfcd0be4b65f2362e.

6

motivations and indicia" of "violent and terroristic activities" under "the umbrella of self-described 'anti-fascism,'" namely: "anti-Americanism, anti-capitalism, and anti-Christianity; support for the overthrow of the United States Government; extremism on migration, race, and gender; and hostility towards those who hold traditional American views on family, religion, and morality."[3]

21. NSPM-7 calls for a "new law enforcement strategy that investigates all participants in these criminal and terroristic conspiracies — including the organized structures, networks, entities, organizations, funding sources, and predicate actions behind them."[4] It calls on "[a]ll Federal law enforcement agencies with investigative authority" to "question and interrogate" individuals engaged in "lawless," and calls on the National Joint Terrorism Task Force and it subcomponents ("NJTTF") to "coordinate and supervise a comprehensive national strategy" to investigate and prosecute individuals "engaged in acts of political violence and intimidation designed to suppress lawful political activity or obstruct the rule of law."[5]

22. Speaking from the Oval Office during the signing of NSPM-7, Deputy Chief of Staff Stephen Miller characterized the directive as "an all-of-government effort to dismantle left-wing terrorism." President Trump claimed that the directive targets "professional agitators and anarchists" and their funders. When pressed to name the "wealthy people" he believes "hired" these individuals, President Trump named

---

[3] NATIONAL SECURITY PRESIDENTIAL MEMORANDUM 7, 90 Fed. Reg. 47,225 (Sep. 25, 2025).
[4] *Id.* § 1.
[5] *Id.* §§ 2(k), 2(a) ("Investigating Domestic Terrorist Organizations")

George Soros and Reid Hoffman—two well-known funders of progressive political activities.[6]

23. The Brennan Center observed that the NSPM-7 directives' "breathtakingly broad list easily encompasses everyone from labor organizers, socialists, many libertarians, those who criticize Christianity, pro-immigration groups, anti-ICE protesters, and racial justice and transgender activists, to anyone who holds views that the administration considers to be 'anti-American.' Under NSPM-7, the antifascist label can be attached to any of these types of people and groups and many more besides, giving the government maximum flexibility to pick and choose its targets."[7]

24. On May 6, 2026, during the period in which Corcelius' property has been in Defendants' custody, the White House released its 2026 "Counterterrorism Strategy" ("USCT 2026").[8] USCT 2026 identifies a "new type of domestic terrorism" marked by "ideologies antithetical to freedom and the American way of life."[9] The White House furthers claims that "Violent Left-Wing Extremists, including Anarchists and Anti-Fascists" are now one of three "major types of terror groups," and that "alliances

---

[6] Nicholas Riccardi, *Trump orders crackdown on 'domestic terrorists' in escalation of a campaign against political rivals*, AP (Sep. 25, 2025), https://apnews.com/article/trump-executive-order-domestic-networks-democrats-9dfc1257ee12cbd376fd53c3ad084327.

[7] Faiza Patel, *Trump's Orders Targeting Anti-Fascism Aim to Criminalize Opposition*, BRENNAN CENTER (Oct. 9, 2025), https://www.brennancenter.org/our-work/research-reports/trumps-orders-targeting-antifascism-aim-criminalize-opposition.

[8] WHITE HOUSE, United States Counterterrorism Strategy 2026 (May 6, 2026), https://www.whitehouse.gov/wp-content/uploads/2026/05/2026-USCT-Strategy-1.pdf.

[9] *Id.* at 4.

between the far-left and Islamists, i.e., the 'Red-Green' alliance'" are a significant new aspect of the "current CT environment."[10]

25. These White House memoranda direct federal agencies to respond to lawful speech and associations, protected by the First Amendment, with an "all-of-government" effort to investigate and prosecute the speakers. As President Trump's comments from the Oval Office demonstrate, the viewpoints targeted for retaliation are so vaguely defined that they could reasonably include any "left-wing" political activity, and all criticism of President Trump, the White House, or the federal agencies.

26. With the White House purporting to target viewpoints that include "anti-Americanism," Defendants are treating persons differently based on the viewpoint they express. The targeting of opposing political opinions is fundamentally undemocratic, violates the First Amendment, and undermines the United States' greatest invention and asset—democratic dissent from the government.

27. Because these policy documents purport to outline new areas of national security concern, they expand the scope of Defendants' border search policies and practices.

*Defendants' Border Search Policies*

28. Under federal regulations, property may only be seized by borders agents at a port of entry if the seizing agents have "reasonable cause to believe that any law or

---

[10] *Id.* at 5, 8.

regulation enforced by Customs and Border Protection or Immigration and Customs Enforcement has been violated, by reason of which the property has become subject to seizure or forfeiture."[11]

29. CBP policy permits the detention of electronic devices, including cell phones, for a "brief, reasonable period of time to perform a thorough border search." Detention beyond the owner's departure from the port of entry requires supervisory approval and the issuance of a receipt. Detention should not exceed five days except in "extenuating circumstances." Detention must be re-approved every five days, and approved by a Field Operations Director or equivalent after fifteen days.[12]

30. "An advanced search is any search in which an officer connects equipment, wired or wireless, to copy and/or analyze the contents of an electronic device."[13]

31. CBP policy permits its agents to conduct advanced or forensic searches of electronic devices at the border with "reasonable suspicion of activity in violation of the laws enforced or administered by CBP or, in the absence of individualized reasonable suspicion when there is a national security concern."[14]

32. CBP policy permits advanced phone searches outside the presence of the phone's owner when "there are national security, law enforcement, officer safety, or

---

[11] 19 C.F.R. § 162.21.
[12] *See* CBP Directive No. 3340-049B ¶¶ 5.4.1 *et seq.* (January 2026), https://www.cbp.gov/sites/default/files/2026-01/cbp_directive_3340-049b_jan_2026_508.pdf.
[13] *Id.* ¶ 3.4
[14] *Id.* ¶ 5.1.4.

other operational considerations that make it inappropriate to permit the individual to remain present."[15]

33. CBP policy permits agents to "convey[] an electronic device or copies of information . . . to HSI for analysis, investigation, and disposition." Upon conveyance, HSI policy governs the handling of a search by HSI agents.[16] However "[e]lectronic devices should be transferred only when necessary to render the requested assistance. Otherwise, a copy of the information from the device should be conveyed in lieu of the electronic device itself."[17]

34. Public court documents support that HSI policy permits searching officers to conduct advanced or forensic searches of electronic devices with "some level of individualized suspicion," but does not limit that suspicion to actual, individualized reasonable suspicion *of a crime* within the scope of the border search exception.[18] Furthermore, HSI policy does not proscribe a "national security" exception to any reasonable suspicion standard.[19]

35. Defendants did not detain the Plaintiff's property for a "brief, reasonable period of time."

---

[15] *Id.* ¶ 5.1.6.

[16] *Id.* ¶ 2.8.

[17] *Id.* ¶ 5.5.1.1.

[18] *See* Plaintiffs' Mot. for Summary Judgment Ex. 20, *Alasaad v. Nielsen*, 419 F. Supp. 3d 142 (D. Mass. 2019) (HSI legal update issued in response to litigation).

[19] *Alasaad v. Nielsen*, 419 F. Supp. 3d 142, 149 n.2 (D. Mass. 2019), a*ff'd in part, vacated in part, rev'd in part sub nom.* Alasaad v. Mayorkas, 988 F.3d 8 (1st Cir. 2021).

36. Defendants did not have any reasonable suspicion that Corcelius was violating any law enforced by the Department of Homeland Security or its subcomponents, nor that the property seized was reasonably related to any violation of law, when she submitted to the customs inspection on April 30, 2026, or at any time thereafter.

*The Plaintiff's Advocacy for Divestment from DHS & ICE*

37. In March 2026, in response to the brutality of federal law enforcement displayed during "Operation Metro Surge," the Minneapolis City Council passed a veto-proof resolution calling on European financial institutions to "divest from all major DHS and ICE contractors, including Palantir, Geo Group, CoreCivic, and CACI International." The City Council's resolution followed several similar local resolutions passed by Minnesota unions, the Twin Cities chapter of the Democratic Socialists of America ("DSA"), the Indigenous Protector Movement, and the Many Shields Society.

38. The Plaintiff, Janette Zahia Corcelius, is a Muslim and Arab American woman living in the Twin Cities. She is a labor organizer, a community organizer, and a human rights advocate. Cornelius actively and lawfully advocated for the DHS/ICE divestment resolutions that swept the Twin Cities in March 2026.

39. In April 2026, Corcelius embarked on a three-week trip to Europe. While abroad, she traveled to several European countries to advocate for divestment from DHS and ICE, in line with the Twin Cities resolutions passed the previous month.

40. In the course of her travels and her advocacy, Corcelius amassed a collection of political literature related to various topics including labor organizing, critique of

12

capitalism, opposition to fascism, imperialism and Zionism, and support for freedom in Palestine. These items included journals, booklets, pamphlets, magazines, posters, and stickers.

*Encounter at Minneapolis-St. Paul International Airport*

41. On April 30, 2026, Corcelius departed on a flight from Amsterdam and landed at the Minneapolis-St. Paul International Airport.

42. Corcelius advanced to the MSP Airport's customs checkpoint, where a CBP agent asked her to submit to a biometric facial scan. Corcelius exercised her right to decline.[20]

43. The CBP agent directed Corcelius to a different customs checkpoint line, where a second CBP agent scanned her passport. The second CBP agent spent a brief moment reviewing something on their computer, which Corcelius could not see, before directing Corcelius to the customs checkpoint's secondary screening area.

44. Corcelius waited in the secondary screening area for approximately 10 minutes before asking a CBP agent if she could pick up her checked luggage from the nearby carousel. Corcelius did not want to leave her checked luggage unattended. The agent consented, and Corcelius left the secondary screening area, retrieved her luggage, and immediately returned.

---

[20] *See* 6 U.S.C. § 1118(c)(4)(C); U.S. CUSTOMS AND BORDER PROTECTION, Biometrics: Privacy Policy, (last visited on May 25, 2025), https://www.cbp.gov/travel/biometrics/privacy-policy ("U.S. citizens who do not wish to submit to facial photo capture . . . may request alternative processing, which typically involves a manual review of their travel documents by a CBP Officer.").

45. When Corcelius returned to the secondary screening area, a CBP agent informed her that they would be conducting a "random" search of her belongings. Corcelius objected, stating that she did not consent to a search. The CBP agent informed her that she could not refuse.

46. Two additional CBP agents arrived. The CBP agents unpacked Corcelius' luggage and set aside all of her political literature in a separate pile. The agents then inspected the political literature by flipping through each page and closely reading the contents.

47. Corcelius took out her cell phone—an Apple iPhone—and called her attorney, Jordan Kushner, believing that the CBP agents did not have the right to search through her belongings.

48. The CBP manager on duty, Assistant Port Director and Defendant Kathleen Koetz, approached the searching CBP agents and Corcelius. Koetz stated that she heard Corcelius was upset and wanted to make a complaint.

49. Corcelius affirmed that she did want to make a complaint. She asked if Koetz would speak directly with her attorney, Kushner, on the phone. Koetz assented. Corcelius then handed Koetz her cell phone, while Kushner was still on the line, for the sole purpose of allowing Koetz to speak with the attorney. Koetz walked away with Corcelius' phone and Corcelius did not see the phone again.

50. The CBP agents searching Corcelius' belongings informed her that the search was completed and allowed her to re-pack her luggage, including the political literature.

14

51. While Corcelius was re-packing her luggage, she observed Koetz speaking with another agent whose uniform indicated they were with Homeland Security Investigations.

52. A second HSI agent approached Corcelius and told her to wait a bit longer, but did not provide a reason why she needed to wait.

53. Corcelius asked the HSI agent if she could have her phone back, noting that Koetz never returned it. The HSI agent told Corcelius that her phone had been seized.

54. The HSI agent further informed Corcelius that her luggage was also being seized. The HSI agent took Corcelius' luggage and told her that she could leave. In response, Corcelius asked why her luggage and her phone were being seized.

55. Koetz approached the HSI agent and Corcelius, and informed Corcelius that her luggage would be returned after the HSI agent conducted another search. Koetz did not mention Corcelius' phone.

56. The HSI agent quickly opened Corcelius' luggage and pulled out all of the political literature that CBP agents had inspected just minutes prior.

57. The HSI agent then returned Corcelius' luggage to her possession, but told Corcelius that all of her literature was being seized and would not be returned that day.

58. The HSI agent produced two DHS "Detention Notice and Custody Receipt for Detained Property." One receipt was for her "Apple iPhone," and the other was for "Approximately 169 miscellaneous items."

59. In the section labeled "Reason for Detention," both receipts listed only "Border Search."

60. In the section labeled "Detaining Officer Name," both receipts were signed by an officer who Plaintiff believes to be HSI agent Jared Drengson.[21]

61. Defendants refused to return Corcelius' property and instructed her that she was free to leave.

62. Corcelius left the MSP Airport without her cell phone or her political literature.

63. No agent of Defendants provided any explanation for the seizures.

64. An advanced search of Corcelius' cell phone was conducted or is currently being conducted outside of her presence.

65. On May 8, 2026, eight days after the April 30 encounter, Corcelius issued a letter to the CBP field office at MSP Airport, demanding the return of her property, the halt of any search of her cell phone, and the deletion of any data obtained through such a search. The letter was forwarded to local DOJ and HSI regional offices. Corcelius requested an answer by May 15, but received no response.

66. At the time of filing and 28 days after seizing Corcelius' property, Defendants have neither responded to Plaintiff nor returned any of the property seized on April 30.

<u>Legal Claims</u>

**COUNT I**
**Violation of the Fourth Amendment:**
**Illegal Search and Seizure of Plaintiff Janette Zahia Corcelius' Property**
**Against all Defendants**

---

[21] Corcelius' belief is based on the signature on both receipts, but the signature is difficult to read.

16

67. Each paragraph of this Complaint is incorporated as if fully restated herein.

68. Count I is brought both as-applied to the Plaintiff and facially.

69. The Fourth Amendment protects individuals from "unreasonable searches and seizures." The Government violated this right with regard to the Plaintiff's cell phone and political literature.

70. At all times, Defendants' border agents were acting under color of federal law.

***Seizure and Search of the Plaintiff's Cell Phone***

71. Defendants have conducted or are in the process of conducting an advanced search of the Plaintiff's phone. *See, e.g.*, *Abu Irshaid v. Garland*, No. 1:24-CV-01405, 2025 WL 756544, at \*9 (E.D. Va. Mar. 10, 2025) (finding that plaintiff's citation of agency "policy, the duration of the searches, and the fact that a 'forensic search generally entails the connection of external equipment and/or the use of specialized software,' is enough to push [p]laintiffs' allegations over 'the line between possibility and plausibility').

72. "Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Riley v. California*, 573 U.S. 373, 393 (2014). For that reason, the Supreme Court acknowledges that the heightened privacy interest represented by cell phones justifies a warrant requirement before a phone can be searched, even when other items could be searched under the "search incident to arrest" exception. *Id.* at 403.

73. While the "border search exception" provides special standards for searches at international borders, the Fourth Amendment is not suspended at customs

17

checkpoints. The non-routine or advanced search of a cell phone at a port of entry requires that searching agents have specific and articulable facts that provide individualized, reasonable suspicion of a crime within the scope of the border search exception. *See United States v. Xiang*, 67 F.4th 895, 900–01 (8th Cir. 2023) (finding that a forensic or advanced phone search is "non-routine" and therefore requires "reasonable, individualized suspicion" under the "appropriate standard"); *U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538, 541 (1985) (finding that non-routine border searches are justified by reasonable suspicion of possession of contraband); *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019); *United States v. Kolsuz*, 890 F.3d 133, 144 (4th Cir. 2018); *United States v. Cotterman*, 709 F.3d 952, 967-68 (9th Cir. 2013); *cf. Riley*, 573 U.S. at 381 ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'").

74. CBP and HSI direct their officers to conduct non-routine searches of electronic devices even if the officers lack the level of individualized reasonable suspicion of a crime that is required by law. For example, CBP's policy explicitly permits an advanced search "in the absence of individualized reasonable suspicion when there is a national security concern."

75. By expressly authorizing non-routine border searches without reasonable suspicion, and therefore authorizing searches not permitted under the Fourth Amendment, Defendants' policies are facially unconstitutional. *See City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 418–19 (2015).

18

76. Defendants did not provide the Plaintiff with any lawful justification for an advanced search.

77. The CBP and HSI agents that seized and searched the Plaintiff's cell phone, lacked any reasonable suspicion that the Plaintiff was committing a crime within the scope of the "border search exception," or any crime at all.

78. Defendants therefore violated the Plaintiff's Fourth Amendment rights when they conducted an advanced search of her cell phone during or following the April 30 encounter at the MSP Airport.

*Indefinite Seizure of the Plaintiff's Property*

79. An extended detention of a person or their property is non-routine and requires at least reasonable suspicion of criminal activity. *See Montoya de Hernandez*, 473 U.S. at 541; *Robbins v. City of Des Moines*, 984 F.3d 673, 680–81 (8th Cir. 2021); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304–05 (D. Minn. 2018) ("As with *Terry* stops, the duration and force involved in a detention are two factors in evaluating whether a detention at the border is non-routine.").

80. Furthermore, while reasonable suspicion can justify an extended detention, it cannot justify an indefinite seizure. Instead, the detention may only last "for the period of time necessary to either verify or dispel the suspicion." *Montoya de Hernandez*, 473 U.S. at 544; *cf. United States v. Sharpe*, 470 U.S. 675, 686 (1985) (testing whether agents "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly").

19

81. Defendants indefinitely seized the Plaintiff's cell phone, or at least seized her phone for an extended period beyond what would be "necessary to either verify or dispel" any suspicion.

82. Defendants indefinitely seized the Plaintiff's political literature, or at least seized her property for an extended period beyond what would be "necessary to either verify or dispel" any suspicion.

83. Both seizures were made without lawful explanation or articulation of reasonable suspicion.

84. At the time of this complaint, these seizures have lasted 28 days—and twenty days since the Plaintiff provided the Government with a written demand from her attorneys for their return.

85. Defendants have therefore violated the Plaintiff's Fourth Amendment rights by conducting a non-routine search of her phone, and indefinite seizure of her property, without lawful justification.

**The Plaintiff's Intent to Continue Her Travel and Expression**

86. The seizure and search of the Plaintiff's property is ongoing, as Defendants remain in possession of her cell phone and political literature.

87. Even if the Plaintiff's property were returned to her possession, she is in immediate apprehension of additional unlawful searches and seizures. *See Arkansas AFL-CIO v. F.C.C.*, 11 F.3d 1430, 1435–36 (8th Cir. 1993) (finding plaintiff's claims were not moot because defendants' actions were "capable of repetition yet evading review")

20

88. The Plaintiff has concrete plans to continue traveling internationally, including a trip to France in May and June 2026, while advocating for divestment from DHS and ICE and, as a natural consequence, carrying the same lawful political literature.

89. The Plaintiff intends to continue invoking her rights during law enforcement encounters.

WHEREFORE, the Plaintiff requests this Honorable Court grant declaratory and injunctive relief in accordance with the Plaintiff's Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT II: First Amendment Retaliation**
**Targeting Based on Protected Speech and Associations**
**Against all Defendants in their Official Capacities**

90. Each paragraph of this Complaint is incorporated as if fully restated herein.

91. Count II is brought both as-applied to the Plaintiff and facially.

92. The First Amendment protects individuals from retaliation by the Government for their lawful political speech and associations.

93. Defendants violated the Plaintiff's First Amendment rights because she "engaged in protected activity," Defendants "took adverse action" against her that would "chill a person of ordinary firmness from continuing in the activity," and "the adverse action was motivated at least in part by the exercise of the protected activity." *Wolk v. City of Brooklyn Ctr.*, 107 F.4th 854, 859–60 (8th Cir. 2024).

94. At all times, Defendants' border agents were acting under color of federal law.

21

*Protected Activity*

95. The Plaintiff engaged in protected speech and association by advocating for European financial institutions to divest from DHS and ICE in the course of her international travel, and in her selection of political literature present in her luggage upon her re-entry to the United States.

96. The Plaintiff's advocacy for divestment from DHS and ICE, and her possession of political literature supportive of labor organizing, opposition to fascism, opposition to imperialism, and more, was entirely and plainly lawful.

97. The Plaintiff also engaged in protected speech when she invoked her Fourth Amendment rights during the April 30 encounter with border agents, including her request to make a complaint to Koetz and her request that Koetz speak with her attorney on the phone.

*Adverse Action Chilling Expression*

98. At the MSP Airport customs checkpoint, the Plaintiff's luggage and cell phone were searched, and her cell phone and political literature were indefinitely seized.

99. As pleaded in Count I, Defendants' actions were unlawful under the Fourth Amendment. But Count II is not dependent on a finding for the Plaintiff on Count I, because "retaliatory conduct does not itself need to be a constitutional violation in order to be actionable" under a First Amendment retaliation claim. *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001); *Aldridge v. City of St. Louis, Missouri*, 75 F.4th 895, 900 n.4 (8th Cir. 2023) (finding "the analyses for First Amendment claims and Fourth Amendment claims are distinct").

22

100.     The seizure and search of a cell phone is a serious invasion of an individual's privacy and would objectively cause a person of "ordinary firmness" to avoid speech or expressive actions that would cause such a privacy violation. *cf. Riley*, 573 U.S. at 403 ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'"); *see Green v. City of St. Louis*, 52 F.4th 734, 739 (8th Cir. 2022).

101.     Furthermore, the close inspection and subsequent seizure of political literature is a jarring act of discrimination that would indicate to an ordinary person that their political viewpoints are being scrutinized and targeted, and that they should no longer carry such items if they wish to avoid invasive scrutiny and seizure in the future—however lawful their expression may be.

102.     Indeed, chilling speech is the point. The objective response of a normal person is legitimized by President Trump's own comments from the Oval Office on September 25, 2025, which indicated that the targeting of political dissenters and the suppression of their speech is the goal of his "all-of-government" effort to investigate "left-wing" "agitators and anarchists."

### *Defendants Actions Were Motivated by the Plaintiff's Expression*

103.     Under NSPM-7 and the other directives from the White House detailed in this complaint, Defendants respond to lawful ideological viewpoints as if they are "indicia" that the speaker represents a national security concern. The ideological viewpoints identified in NSPM-7 are intentionally broad and undefined in order to

sweep in all criticism of the White House and the federal agencies, including Defendants.

104. The framing of rival political ideologies as national security threats is an unlawful weaponization and exploitation of the United States' national security apparatus. Because Defendants were already authorized to investigate violations of criminal law at the border, the only effect of NSPM-7 and its sister directives on Defendants is to unlawfully broaden the scope of "national security concerns" that can be investigated to include speech and associations protected by the First Amendment. *Patel*, 576 U.S. at 418–19.

105. As applied to the Plaintiff, Defendants were aware of the Plaintiff's expressive activity when they searched her luggage, and demonstrated special interest in her political literature in line with directive from NSPM-7.

106. Defendants only announced the seizure of the Plaintiff's cell phone after viewing her political literature and after the Plaintiff saw Koetz speak with an HSI agent.

107. Defendants only seized the Plaintiff's political literature after CBP agents closely inspected the items once and the Plaintiff observed Koetz speak with an HSI agent. At that point, an HSI agent seized the Plaintiff's luggage and, while Koetz was present, opened the luggage in order to specifically seize the Plaintiff's political literature.

24

108. In the alternative, Defendants only seized and searched the Plaintiff's property after she lawfully voiced that she did not consent to a search, that she would like to make a complaint, and that she would like Koetz to speak to her attorney.

109. Defendants did not have any reasonable suspicion of a crime necessary to justify non-routine searches and seizures of Plaintiff's property.

110. Because the "nonretaliatory grounds are in fact insufficient to provoke the adverse consequences," retaliation is the reasonable "but-for cause of official action offending the Constitution." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see Green*, 52 F.4th 740 (concluding that a finding that no crime committed is enough to plausibly allege that adverse action was in retaliation to First Amendment activity).

WHEREFORE, the Plaintiff requests this Honorable Court grant declaratory and injunctive relief in accordance with the Plaintiff's Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### Prayer for Relief

WHEREFORE, Plaintiff Janette Zahia Corcelius respectfully requests:

111. Declaratory judgment that Defendants' violated the Plaintiff's Fourth and First Amendment rights under the United States Constitution;

112. Declaratory judgment that Defendants' border search policies are facially unconstitutional because they do not require the level of suspicion necessary justify a non-routine electronic border search;

113. Declaratory judgment that Defendants' implementation of NSPM-7, the September 22 executive order, and the 2026 Counterterrorism Strategy, in conjunction with Defendants' border search policies, are facially unconstitutional under First Amendments;

114. Injunctive relief as follows:

    a. Enjoining Defendants from non-routine search and seizure of the Plaintiff's property unless justified by the requisite standards under the law;

    b. Enjoining Defendants from repeating its actions against the Plaintiff under the same unlawful justifications;

    c. Ordering Defendants to revise their non-routine search policies to align with the legal standard;

    d. Ordering Defendants to immediately cease any advanced search of the Plaintiff's phone;

    e. Ordering Defendants to immediately remove and expunge, from any and all record or system, information gathered from their search the Plaintiff's cell phone, and to take all steps necessary to identify and delete any such information sent to other agencies, entities, or people not named in this complaint;

    f. Ordering Defendants to immediately return the Plaintiff's property to her possession;

115. An award of attorneys' fees, costs, and expenses of all litigation;

116. Such other and further relief as the Court may deem just and proper.

**<u>Jury Demand</u>**

NOW COMES the Plaintiff, by and through her undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action.

Dated: May 28, 2026                    Respectfully Submitted,

/s/ Alec Shaw

CAIR-MINNESOTA
Alec Shaw
2708 E. Lake St., Ste. 202
Minneapolis, MN 55406
Telephone: 612-206-3360
Email: ashaw@cair.com

CAIR LEGAL DEFENSE FUND
Lena Masri*
Gadeir Abbas*α
John Fossum*
453 New Jersey Ave SE
Washington, DC 20003
Telephone: 202-742-6420
Email: ldf@cair.com

*Pro Hac Vice applications forthcoming

α Mr. Abbas is admitted in VA.
Practice limited to federal matters.

Counsel for Plaintiff

27